**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

STATE OF OKLAHOMA, ex rel.    )
KIM HOLLAND, Insurance Commissioner, )
As Receiver of Hospital Casualty Company )
                     )
           Plaintiff,   )
vs.              )    Case No: 5:06-CV-426
                     )
EMPLOYERS REINSURANCE   )
CORPORATION, a Missouri    )
Corporation            )
          Defendant.  )

## PLAINTIFF STATE OF OKLAHOMA, EX REL., KIM HOLLAND, INSURANCE COMMISSIONER, AS RECEIVER OF HOSPITAL CASUALTY COMPANY'S BRIEF IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT

Robert A. Nance, OBA No. 6581
George M. Emerson, OBA No. 13159
Riggs, Abney, Neal, Turpen, Orbison & Lewis
5801 Broadway Ext., Suite 101
Oklahoma City, OK 73118
(405) 843-9909 - Telephone
(405) 842-2913 - Facsimile

Michael E. Waldeck
9393 W. 110th Street, Bldg. 51
Overland Park, KS 66210
913-323-4910 - Telephone
913-323-4911 - Facsimile

Vincent F. O'Flaherty
Spradley & Riesemeyer P.C.
4700 Belleview Avenue, Suite 210
Kansas City, MO 64112
(816) 753-6006 – Telephone
(816) 502-7898 – Facsimile
ATTORNEYS FOR PLAINTIFFS

## **TABLE OF CONTENTS**

I.    SUMMARY OF THE RECEIVER'S LEGAL POSITION ................................. 5

II.   NATURE OF THE MATTER BEFORE THE COURT .................................. 5

III.  STATEMENT OF UNCONTROVERTED FACTS ...................................... 6

    A.    The Mulbery Claim ...................................................... 6

    B.    The Hepatitis Claim .................................................... 12

IV.   ARGUMENTS AND AUTHORITIES ............................................... 17

    A.    Summary Judgment Under Rule 56: ....................................... 17

    B.    Oklahoma Law on Contract Interpretation ............................... 18

    C.    Overview of Reinsurance ............................................... 19

    D.    Rules of Reinsurance Contract Interpretation .......................... 20

    E.    The Mulbery Claim:  Counts I and III .................................. 21

    F.    The Hepatitis Claim:  Counts II and IV  .............................. 28

V.    CONCLUSION ............................................................... 35

**TABLE OF AUTHORITIES**

Cases

Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998) ............................................ 17

Aetna Cas. & Surety Co. v. Home Ins. Co., 882 F.Supp. 1328 (S.D. N.Y. 1995) ...................... 25

Affiliated F.M. Ins. Co. v. Employers Reinsurance Corp., 369 F.Supp.2d 217, 226-227 ........... 25

Affiliated FM Insurance Co. v. Constitution Reinsurance Corp., 626 N.E.2d 878, 880 (Mass.
    1994) ...................................................................................................................................... 20, 21

Am. Employer's Insurance. Co. v. Swiss Reins. Am. Corp., 275 F.Supp.2d 29, 35, Fn 32
    (D.Mass. 2003) ........................................................................................................................... 25

American Insurance Company v. American Re-Insurance Company, 2006 WL 3412079 (N.D.
    Cal. Nov. 27, 2006) ..................................................................................................................... 31

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ................................................................. 17

Brogden v. Perryman, 176 Okla. 505, 56 P.2d 398, 399 (Okla. 1936) ......................................... 19

Celotex Corp. v. Catrett, 477 U.S. 317 (1986). ........................................................................... 17

Christiana General Insurance Corp. v. Great American Insurance Co., 979 F.2d 268, 271 (2nd Cir.
    1992) ................................................................................................................................. 19, 20, 21

Employers Reinsurance Corp. v. Mid-Continent Casualty, 358 F.3d 757, 764 (10th Cir. 2004).. 18

First Bank of Turley v. FDIC, 928 P.2d 298, 302 & n. 6 (Okla. 1996) ....................................... 18

Hartford Accident & Indemnity Co. v. Columbia Casualty Co., 98 F. Supp.2d 251, 258 (D.
    Conn. 2000) ................................................................................................................................ 24

Hartford Accident and Indemnity Co. v. Ace American Reins. Co., 2005 WL 3663930 (Conn.
    Super) *6 ...................................................................................................................................... 24

Hulsey v. Kmart, Inc., 43 F.3d 555 (10th Cir. 1994) .................................................................... 18

International Surplus Lines Ins. Co. v. Certain Underwriters at Lloyd's London, 868 F. Supp.
    917 (S.D. Ohio 1994) ................................................................................................................. 25

Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888-89 (1990) .................................................. 18

Lum v. Lee Way Motor Freight, Inc., 757 P.2d 810, 815 (Okla. 1987) ....................................... 19

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)................................... 17

National American Insurance Co. of Cal. v. Certain Underwriters at Lloyd's London, 93 F.3d 529 (9th Cir. 1996) (later reversed by the 9th Cir.) ................................................................. 25

National Union Fire Ins. Co. of Pittsburg v. American Re-Ins. Co., 441 F.Supp.2d 646 (S.D.N.Y. 2006).................................................................................................................................. 29

North River Ins Co. v. Ace American Reinsurance Co., 361 F.3d 134 (2nd Cir. 2004) .. 24, 25, 32, 33

North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1199 (3d Cir. 1995).... 19, 20, 24

Ott v. All-Star Insurance Corp., 299 N.W.2d 839, 843 (Wis. 1981) ........................................... 20

Pitco Production Co. v. Chaparral Energy, Inc., 63 P.3d 541, 545 (Okla. 2003) ........................ 18

Polk v. Bartlett, 365 P.2d 987, 989-90 (Okla. 1961) ................................................................. 19

Sinclair Oil & Gas Co. v. Bishop, 441 P.2d 436, 442-43 (Okla. 1967)...................................... 19

Travelers Casualty & Surety Co. v. Gerling Global, 419 F.3d 181 (2d Cir. 2005) ..................... 31

Travelers Casualty & Surety Co., v. Certain Underwriters of Lloyd of London, 96 N.Y.2d 583, 734 N.Y.S.2d 531, 534, 760 N.E.2d 319 (2001) ............................................................. 19, 20

Zenith Ins. Co. v. Employers Insurance of Wausau, 141 F.3d 300, 304 (7th Cir. 1998) ............. 20

**Statutes**
15 Okla Stat. §163................................................................................................................. 19
15 Okla. Stat. §152................................................................................................................ 18

**Treatises**
19 Couch on Insurance §80:49 .............................................................................................. 20

Plaintiff State of Oklahoma, ex rel., Kim Holland, Insurance Commissioner, As Receiver of Hospital Casualty Company ("Receiver") for her Brief in Support of her Motion for Summary Judgment, states the following:

## I.    SUMMARY OF THE RECEIVER'S LEGAL POSITION

This case involves the interpretation of reinsurance agreements between the Receiver on behalf of Hospital Casualty Company ("HCC") and the Defendant Employers Reinsurance Corporation ("ERC").  The Receiver is entitled as a matter of law to receive a declaration that ERC is contractually bound to reimburse HCC on two separate claims involving reinsurance coverage as follows: (1) $498,000 on the Mulbery claim as "loss" under the reinsurance agreement between HCC and ERC; (2) $201,237 on the Mulbery claim as "claim expenses" and (3) $152,160 on the Hepatitis claim as "claim expenses" under the reinsurance agreement between HCC and ERC.  Additionally, the Receiver seeks a declaration that HCC's allocation of settlement payment on the Hepatitis claim is reasonable and enforceable against ERC under the reinsurance doctrine known as Follow the Fortunes.  Because the reinsurance agreements are plain and unambiguous, this Court may interpret them as a matter of law and accordingly render judgment in favor of the Receiver.

## II.    NATURE OF THE MATTER BEFORE THE COURT

This matter is before the Court on the Receiver's Motion for Summary Judgment seeking an order of this Court granting summary judgment in the Receiver's favor against ERC on Counts I: (Breach of Contract on the Mulbery claim), II: (Breach of Contract on Norman Regional Hospital claim), III: (Declaratory Judgment on Mulbery claim), and IV: (Declaratory

Judgment on Norman Regional Hospital claim) of the Receiver's Complaint and awarding damages to the Receiver.

### III.    STATEMENT OF UNCONTROVERTED FACTS

1.    Employer's Reinsurance Corporation ("ERC") is a Missouri corporation with its principal place of business in Overland Park, Kansas.  (Exh. 1).

2.    On August 6, 2004 Hospital Casualty Company ("HCC") was placed into receivership in Oklahoma in an attempt to rehabilitate HCC. (Exhibit 2: Agreed Order).  Those rehabilitation efforts were unsuccessful resulting in the ordering of the liquidation of HCC.  On October 1, 2004 the District Court of Oklahoma County entered an order directing the Receiver of HCC to liquidate the assets of HCC. (Exhibit 3: Agreed Order of Liquidation).

3.    In the Order of Liquidation it was noted that HCC is an Oklahoma domesticated insurance company whose business practices qualify it as an "insurer" pursuant to Oklahoma law. (Exhibit 3: ¶1).  Said Order also ordered the Receiver to take possession of the property of HCC, to liquidate its business, and to deal with HCC's property and business in her own name or in the name of HCC pursuant to 36 O.S. § 1911. (Id. ¶5, pg. 3-4).

4.    The Receiver has identified several facultative reinsurance certificates purchased by HCC from ERC that are assets of the Receivership. (Exhibit 8, 20, 21).

5.    On March 21, 2006 the Receiver filed her Petition for Declaratory Judgment and Damages in the District Court of Okalahoma County.  On April 17, 2006 ERC filed its Notice of Removal. (Exhibit 4, 5, 6).

### A.    The Mulbery Claim

6.    HCC sold and issued primary and umbrella policies to Amity Care Corporation ("Amity").  Amity is in the nursing home business.  Amity purchased a primary insurance policy

from HCC in the amount of $1,000,000 per occurrence.  (Exh. 7: Douglas deposition, p. 27:9-

25).   Amity also purchased an umbrella insurance policy from HCC in the amount of $5,000,000

for the same policy year. (Id.)

      7.   HCC did reinsure the umbrella policy through ERC. (Exh. 7, p. 27:9 – p. 29:24; Exh.

8)   HCC agreed to pay a reinsurance premium of $43,294 and ERC agreed to reinsure 100% of

any payments made under HCC's umbrella policy with Amity subject to the terms and

conditions of the "Facultative Reinsurance Certificate" (the "Reinsurance Agreement"). (Exh. 7,

p. 28:8 – p. 31:1; Exh. 8).   The Reinsurance Agreement, in pertinent part, stated:

> Employers Reinsurance Corporation of Overland Park, Kansas (hereinafter called the
> "Corporation") agrees with the Reinsured named in the Reinsurance Schedule made a
> part hereof, in consideration of the premium and subject to all the terms of this
> agreement, as follows:
>
>                        \* \* \*
>
> II.     RETENTION AND INDEMNITY.  As respects loss sustained by the
> Reinsured under the Reinsured Policy, the Reinsured shall retain as its own net
> retention, including other reinsurance, loss as indicated in Item 7C of the
> Reinsurance Schedule and the Corporation hereby agrees to indemnify the
> Reinsured against loss as indicated in Item 7D of the Reinsurance Schedule.
>
> III.    DEFINITION OF LOSS AND CLAIM EXPENSES.  The unqualified word
> "loss" shall mean only such amounts as are actually paid by the Reinsured in
> settlement of claims or in satisfaction of awards or judgments; but the word
> "loss" shall not include claim expenses……
>
> The term "claim expenses" shall mean court costs interest upon judgments and
> allocated investigation, adjustment and legal expenses.
>
> Neither the word "loss" nor the term "claim expenses" will include salaries
> paid to employees of the Reinsured.
>
> IV.    INDEMNITY FOR CLAIM EXPENSES.  The Corporation hereby agrees that,
> as respects reinsurance afforded by the other terms of this certificate, the
> Corporation will, with respect to each occurrence (each claim if written on a
> claims made basis), indemnify the Reinsured against that proportion of the
> claim expenses paid by the Reinsured that the amount of the loss ultimately
> borne by the Corporation bears to the total amount of the loss.

(Exh. 8, pg. 2)

8.    HCC received notice of a personal injury/wrongful death claim by the estate of Bonnie Mulbery against Amity. (the "Mulbery claim"). (Exh. 9: Matson depo. p. 44:14-20). The Mulbery claim sought actual and punitive damages against Amity and others due to an alleged drug overdose received by Bonnie Mulbery while a resident in one of Amity's nursing homes.  (Exh. 10: Mulbery Petition).  HCC defended the Mulbery claim under the policies of insurance. ( Exh. 9 p. 17:24 - p.18: 9).

9.    HCC's claims handler for the Mulbery claim was Anita Matson.  (Exh. 9, p. 10:3-6, 16:14-20).  Matson timely notified ERC of the Mulbery claim to ERC due to potential umbrella policy exposure.  Matson also timely provided status reports to ERC during all phases of the Mulbery claim. (Exh. 7, p. 40:1-3).  In February, 2003 ERC was on notice that the Mulbery claim was going to jury trial in Oklahoma State Court. (Exh. 7, p. 39:15 – p. 40:15).

10.    Amity's corporate representative was Don Greiner. (Exh. 11: Greiner depo.)  Both Greiner and Matson attended trial on the Mulbery claim. (Exh. 9, p. 18:16-18; Exh. 11 p. 10:4-7, 12:1-13, 14:18-22).   On February 19, 2003, a verdict was reached finding in favor of the Mulbery Plaintiffs against Amity. (Exh. 12: Mulbery Verdict, Exh. 14: HCC post trial report, pg. 2).   The verdict assessed the amount of actual damages in the sum of $1,500,000.  The jury also found by clear and convincing evidence that Amity acted in reckless disregard of the rights of others. (Id.).

11.    After the verdict was read the trial court advised the jury that a second phase would be held for the jury to award punitive damages.  The jury informed the judge that it was their intent that the $1,500,000 verdict included an award of punitive damages. (Exh. 14, pg. 2).  The jury stated it was their intent to award $500,000 actual damages and $1,000,000 punitive

damages. (Id.) The court stated the jury was in error, withdrew the verdict and ordered the jury

to deliberate again and only award actual damages. (Id.) The jury returned the same day with its

second verdict. (Exh. 13). The jury assessed actual damages of $1,000,000 and found by clear

and convincing evidence that Amity acted in reckless disregard of the rights of others. (Id.). The

trial court accepted the second verdict and instructed the jury to return on April 1, 2003 for a

second phase on punitive damages. (Exh. 14, pg. 3).

12.    After the verdict but before the second phase on punitive damages was held,

settlement negotiations occurred between the Mulbery plaintiffs, Amity and HCC. HCC

analyzed potential exposure to Amity for the claim after the second phase was as follows:

| | |
|---|---|
| Actual Damages: | $1,000,000 |
| Prejudgment Interest | $121,185.34 |
| Punitive Damages: | $500,000 – 1,000,000 |
| Plaintiffs' Statutory Expenses: | $600,000 – 650,000 |
| Total Exposure: | $2,220,000 – 2,800,000 |

(Exh. 14, pg. 3)

13.    HCC took the position with Amity that any award of punitive damages was not

covered under the umbrella policy. (Id.; Exh. 15). Amity disagreed and requested that HCC

settle the case within the policy limits of the umbrella policy. (Exh. 15; Exh. 11, p. 33:14 – p.

35:6). Specifically, Amity wrote to HCC on February 28, 2003 and stated:

> "In addition, neither the underlying policy nor the excess policy specifically
> exclude punitive damages. Rather, the only exclusion related to damages to
> be paid under the policy is: "Damages shall not include fines or penalties
> imposed pursuant to law, or matters that may be deemed uninsurable under
> the law, pursuant to which the policy shall be construed. In discussing this
> with Mr. Phillips, it is my understanding that the exclusion does not exclude
> any punitive damages that may be awarded against the defendants in this case

9

since the actions allegedly giving rise to the finding of "reckless disregard" of another's rights were committed by facility level employees for which Amity Care, LLC and Western Nursing Home Limited Partnership were found to be vicariously liable.  T. Ray suggested I have you reference <u>Magnum Foods, Inc. v. Continental Casualty Company</u>, 36 F.3d 1491 (10th Cir. 1994).  Apparently, applying Oklahoma law, holding public policy does not prohibit liability insurance coverage of punitive damages where the party seeking the benefit of the coverage has been held liable for punitive damages solely due to the conduct of another under the principles of vicarious liability."

(Id.)  In the same letter Mr. Greiner requested that HCC settle the case within policy limits and within the plaintiff's current $2 million demand. (Id.)  Mr. Greiner also expressed a willingness to contribute corporate funds to help get the case settled. (Id.)  Amity was very concerned about the plaintiff's alter ego theory against other related companies. (Id.).  It was employees or agents of Amity who did the care for Ms. Mulbery, put the patches on her, and caused or contributed to cause Ms. Mulbery's death. (Exh. 11, p. 30:8-21; Exh. 10, ¶ 17, 19, 20, 29, 35).

14.    Amity and HCC reached a compromise which resulted in settlement of the Mulbery claim for a total sum of $1,750,000.  The settlement was funded as follows:

| | | |
|---|---|---|
| HCC: | $1,000,000 | Primary Policy Limits |
| HCC: | $498,000 | Excess Policy Payment |
| <u>Amity:</u> | <u>$252,000</u> | |
| Total: | $1,750,000 | |

Amity and HCC received a complete release from the Mulbery plaintiffs for all claims.  From Amity's position the biggest factor towards driving a settlement was the uncertainty of what could happen in a punitive phase from a dollar standpoint. (Exh. 11, p. 18:5-15).  The settlement settled not only the $1 million verdict, but settled the whole case including the second phase or threatened punitives and other things. (Exh. 11, p. 35:15-20).  The settlement settled all claims

and ended the whole litigation. (Id. p. 35:21-24).  Amity believes the settlement was reached in good faith. (Id. p. 35:25 – p. 36:6).

15.    ERC was kept apprised of all settlement negotiations by Matson and her HCC supervisor Ray Birkinsha. (Exh. 7, p. 42:19-22).  ERC never objected to the settlement of $1,750,000.  ERC does not contend the settlement was unreasonable. (Exh. 7, p. 45:1-7).

16.    On June 11, 2003 Matson sent a written request for reimbursement under the Reinsurance Agreement for $498,000 paid to settle the Mulbery claim. (Exh. 16).  HCC requested reimbursement because the $498,000 represented "loss" under the Reinsurance Agreement's definition of "loss."  (Id.)  The following day, on June 12, 2003, Matson sent a written request for reimbursement for $194,758.46 of "claim expenses" paid on the Mulbery claim. (Exh. 17).  The "claim expenses" as of June 12, 2003 totaled $585,839.72 were incurred in investigating, defending and trying the claim ( Id.).  HCC requested that ERC reimburse HCC for the pro rata share of expenses that the payment under the umbrella policy ($498,000) bore on the total amount paid by HCC ($1,498,000).  The pro rata calculation was arrived as follows:

$498,000:        Total paid under Excess Policy  = .33
$1,498,000:      Total paid by HCC

.33 x $585,839.72 (Total Claim Expenses) = $194,758.46 (ERC's share of Pro Rata Expenses) (Id.).

17.    On July 15, 2003 ERC denied HCC's request for reimbursement of $498,000 in loss and $194,758.46 in claim expenses.  (Exh. 18).  ERC grounded its denial by taking the position that the $498,000 was not paid under the HCC excess policy. (Id.)   Rather, ERC contended the $498,000 represented "costs" as opposed to "damages." (Id.)  ERC stated that in its opinion HCC paid $498,000 to resolve exposure for plaintiff's attorney fees that would be awarded under Oklahoma's Nursing Home Care Act. (Id.)  As such, ERC characterized the entire $1,498,000 as

being under the primary policy thereby removing any duty to reimburse the $498,000 as "loss" and $194,758.46 as "claim expenses." (Id.)

18.    "Loss" is defined in the agreement  to be: "such amounts as are actually paid by the Reinsured [HCC] in settlement of claims or in satisfaction of awards or judgments." (Exh. 8). Item 7D of the Reinsurance Schedule required ERC to indemnify HCC for 100% of the Reinsured Policy Limit.  The "Reinsured Policy Limit" as stated in 7B of the Reinsurance Schedule was: "5,000,000 EACH OCCURRENCE AND ANNUAL AGGREGATE WHERE APPLICABLE IN EXCESS OF UNDERLYING LIMITS." (Exh. 8)

**B.    The Hepatitis Claim**

19.    Norman Regional Hospital (NRH) is a hospital located in Norman, Oklahoma that provides healthcare for the residents of Oklahoma.  (Exh. 19).

20.    NRH purchased occurrence based HCC primary policies and HCC excess policies during the years 1999-2002. (Exh. 19, pg. 3).  The HCC primary policy limits were $1,000,000 per occurrence and $3,000,000 annual aggregate. (Id).  The HCC umbrella excess policy limits were $2 million per occurrence and annual aggregate. (Id.)

21.    HCC purchased facultative reinsurance policies reinsuring the HCC excess policies issued to NRH (the "NRH Reinsurance Certificates").  The NRH Reinsurance Certificates reinsured HCC for the following years under the following ERC Certificate numbers:

| Years | ERC Certificate  Number |
|---|---|
| 7/1/00 – 7/1/2001 | FCM-0633423-00-2000 (Exh. 20) |
| 7/1/01 – 7/1/2002 | FCM-0642527-00-2001 (Exh. 21) |

22.    Each NRH Reinsurance Certificate had a reinsured policy limit of $2,000,000 for each occurrence and annual aggregate. (Id).  Each NRH Certificate required ERC to indemnify HCC for 100% of any payments made under the HCC excess policy up to a limit of $2 million.

(Id).  In addition to the indemnity obligation, ERC also agreed to reimburse and indemnify HCC for a percentage of HCC's claim expenses paid by HCC. (Id). The percentage of claim expenses paid by ERC was determined by a calculation of the amount of "loss" ultimately borne by ERC bore to the total amount of the entire "loss."  (Id).  HCC paid to ERC premiums of (a) $97,850 for the 2000-2001 policy  year; and (b) $122,605 for the 2001-2002 policy year. (Exh. 20 and 21).

    23.    From 1999 through July, 2002, NRH maintained a pain management clinic. (Exh. 19, pg. 1).   Dr. Jerry W. Lewis, M.D. ("Dr.  Lewis") was a physician working at the NRH pain management clinic. (Id.)  Mr. James C. Hill, CRNA ("CRNA Hill") was a Certified Registered Nurse Anesthetist employed by NRH at the NRH pain management clinic. (Id.)

    24.    From August, 1999 to May, 2002 CRNA Hill repeatedly reused needles and syringes on possibly as many as 900 patients who came to the NRH pain management clinic for treatment. (Id. p. 7).  The reuse of needles and syringes resulted in actual, as well as probable, cross contamination of patients' bloodstreams with life threatening viruses and diseases including Hepatitis C (HCV) and Hepatitis B (HBV). (Id.)  Hepatitis is a disease and condition that attacks and inflames a person's liver.

    25.    When symptoms of viruses and diseases began to manifest themselves in 2002, an Oklahoma State Board of Health examination was ordered and a series of lawsuits and a class action were filed by persons who received the pain management treatment from CRNA Hill at NRH. (the "Hepatitis Litigation"). (Id. pg. 2, 8).

    26.    NRH placed HCC on notice of the claim and sought defense and indemnity under NRH's primary and excess policies with HCC (the "Hepatitis Claim").  HCC retained Glen Huff of Folliart, Huff, Ottaway & Bottom of Oklahoma City, Oklahoma as defense counsel for NRH

for the Hepatitis Claim. (Exh. 22).  Ray Birkinsha ("Birkinsha") was the Vice President of

Claims of HCC responsible for handling of the Hepatitis Claim on behalf of HCC. (Id.; Exh. 23,

pg. 43:4-8).

     27.    HCC timely notified ERC of the Hepatitis claim.  At all times ERC participated in,

consulted on, and was aware of the handling of the Hepatitis Claim.  Galen Mussman was the

point man for ERC beginning fairly early in 2003. (Exh. 23, pg. 49:8-17).

     28.    During 2003 various efforts were undertaken by NRH, HCC and the other parties to

the Hepatitis Litigation to settle the Hepatitis Claim. (Exh. 24, pg. 1).  On August 7, 2003 a

mediation was held in the Hepatitis Litigation (the "Mediation").(Id.)  A tentative settlement

agreement was reached in the Mediation between all defendants and the plaintiffs' coordinating

counsel committee. (Id.)  In attendance at the Mediation was Birkinsha for HCC and a

representative of ERC, Galen Mussman. (Exh. 23, pg. 49:8-13).   Also in attendance was defense

counsel for NRH, Glen Huff. (Exh. 24, pg. 1).

     29.    The terms of the tentative settlement included a lump sum cash payment of

$25,120,000. (Exh. 24, pg. 4).  The lump sum was to be funded as follows: (a) $10,951,666.68

on behalf of NRH; (b) $6,451,666.66 on behalf of Dr. Lewis; (c) $7,416,666.66 on behalf of

CRNA Hill; and (d) $300,000 on behalf of two other defendants, Northwest and OCOM. (Id.)

     30.    At the Mediation it was agreed between HCC and NRH that NRH's $11 million

settlement payment would be funded as follows: (a) an amount up to $8 million from HCC (the

HCC Settlement Contribution); and (b) an amount up to $3 million from NRH (the NRH

Settlement Contribution). (Exh. 24, pg. 4).

     31.    Also at the Mediation it was agreed between HCC and NRH that the HCC

Settlement Contribution would be allocated as follows: (a) $3 million from HCC's primary

policy for year 2000-2001; (b) $1 million from the 2000-2001 HCC excess policy; (c) $3 million from HCC's primary policy for year 2001-2002; and (d) $1 million from the 2001-2002 HCC excess policy. (Id.)

32.    At the Mediation it was understood and agreed between NRH and HCC that once the Hepatitis settlement was concluded and funded NRH would still have approximately $1 million in available limits remaining under the HCC excess policy for 2000-2001 and approximately $1 million in available limits remaining under the HCC 2001-2002 excess policy. (Id.)

33.    Galen Mussman, ERC's representative, was present during a lot of discussion about allocating the settlement equally between the two policy years. (Exh. 28, p. 48:24 – p. 49:11). Birkinsha and Mussman authorized spending $4 million on the 2000-2001 policy and $4 million n the 2001-2002 policy. (Id. p. 55:4 – p. 56:21).  Everyone knew the 2001-2002 policy was holding back $1 million for non hepatitis claims against NRH. (Id. p. 48:24 – p. 50:18, p. 58:1-8).

34.    As of the Mediation in August, 2003, a total of one hundred six (106) lawsuits had been filed.  The settlement of the Hepatitis Litigation intended to settle not only these claims but also all other potential claims.  As a result, from August, 2003, through February, 2004, various activities, including negotiation of the terms of the settlement and securing court approval of the settlement, were undertaken. (Exh. 24, ERCN 0580; Exh. 25)

35.    During the first week of February, 2004, the settlement was concluded and funded by all parties including the remainder of HCC's $8 million Settlement Contribution. (Exh. 25, 26)

36.    On January 27, 2004, HCC sent a written demand to ERC for reimbursement and indemnity of $2,037,305.10 in "loss" it paid under the NRH Reinsurance Certificates. (Exh. 25,

pg. 1).  In addition to the demand for reimbursement and indemnity for the "loss" of $2,037,305.10 under the NRH Reinsurance Certificate, HCC on January 27, 2004, also made demand for reimbursement and indemnity from ERC of "claim expenses" of $144,480 for the Hepatitis Claim. (Id.)

37.    On or about February 4, 2004, ERC paid to HCC the $2,037,305.10 in "loss" demanded by HCC.  (Exh. 26, pg. 2).  However, ERC incorrectly stated that the "loss" would be allocated by ERC as $2,000,000 to the 2001-2002 NRH Reinsurance Certificate and $37,305.10 to the 2000-2001 NRH Reinsurance Certificate. (Id.)  Therefore ERC incorrectly took the position that the 2001-2002 NRH Reinsurance Certificate had been fully exhausted with no further limits available to reimburse and indemnify HCC for future "loss." (Id.)

38.    On January 27, 2004 HCC made a claim for expenses to ERC (Exh. 25, p. 2-3).  As of January 27, 2004 HCC had spent approximately $430,000 in defense and handling of the Hepatitis claim.  Under the formula of the Reinsurance Agreement ERC would be obligated to pay a pro rata share of expenses which totaled $144,480.  ERC denied the request stating that all defense costs were paid under the primary policy and not the umbrella policy. (Exh. 26).

39.    On January 30, 2004 HCC reminded ERC that ERC had always paid primary policy expenses on a pro rata basis on reinsured excess policies. (Exh. 27: ERCN 0382).  Also, Anita Matson, HCC's claim representative handling the Mulbery claim, is sure she requested ERC to pay pro rata share for incurred expenses on other files. (Exh. 9, p. 64:3-8).  It was on three or four other files. (Id. p. 64:14-21).  She does not remember the insured's names. (Id.)

40.    The Receiver is still adjudicating claims made against NRH during these two policy years which NRH has tendered for coverage.  The most significant claim that is still pending during the 2001-2002 policy year is the Mitchell claim.  (Exh. 9,p. 33:17-21).  The Mitchell

claim is against NRH. (Id).  It arises during the 2001-2002 policy year. ( Exh 29).  It is a death case involving a man who was treated for a bleeding ulcer in the NRH emergency room. (Exh. 9, p. 34:17-25).  The file is still in discovery. (Id. p. 35:25 – p. 36:5).  The Mitchell claim has been reported to the Receiver as having a potential exposure as high as $1,000,000. ( Exh 29).

## IV.    ARGUMENTS AND AUTHORITIES

### A.  Summary Judgment Under Rule 56:

Summary judgment is proper if the movant demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  *See also*, Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  In applying this standard, the Court views the factual record and draws all reasonable inferences therefrom most favorably to the non-movant.  *See* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).  An issue is "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim.  Id.  If a party that would bear the burden of persuasion at trial does not come forward with sufficient evidence on an essential element of its prima facie case, all issues concerning all other elements of the claim and any defenses become immaterial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  Celotex, 477 U.S. at 323.  If the movant carries this initial burden, the non-movant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the non-movant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in

the event of trial from which a rational trier of fact could find for the non-movant.  Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888-89 (1990).  The non-movant "may not rest upon mere allegation or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial."  Hulsey v. Kmart, Inc., 43 F.3d 555 (10th Cir. 1994).

     **B.  Oklahoma Law on Contract Interpretation**

Oklahoma law governs the interpretation of the Reinsurance Agreements between HCC and ERC.  The Agreements were marketed, sold and issued to HCC in Oklahoma.  Both the Mulbery and Hepatitis claims involved activities occurring in Oklahoma.

Under Oklahoma law the court interprets a reinsurance contract in accordance with principles applicable to all contracts.  Employers Reinsurance Corp. v. Mid-Continent Casualty, 358 F.3d 757, 764 (10th Cir. 2004); First Bank of Turley v. FDIC, 928 P.2d 298, 302 & n. 6 (Okla. 1996).  "A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting…."  15 Okla. Stat. §152.  Ordinarily, this means that the contract should be construed according to the plain meaning of its language.  Id. at §§154, 160.  The court determines, as a matter of law, whether the contract is ambiguous.  Pitco Production Co. v. Chaparral Energy, Inc., 63 P.3d 541, 545 (Okla. 2003).  A contract is ambiguous if it is reasonably susceptible to more than one meaning.  Id. at 545-546. "The mere fact the parties disagree or press for a different construction does not make an agreement ambiguous."  Id. at 545.

If the court finds the contract to be unambiguous, it then interprets the contract as a matter of law.  Id. at 545; Employers Reinsurance Corp. v. Mid-Continent Casualty, 358 F.3d at 764.  If the court cannot determine the intent of the parties from the contract itself (that is, if the contract is ambiguous), the court may look to "the circumstances under which [the contract] was

made, and the subject-matter to which it relates." Sinclair Oil & Gas Co. v. Bishop, 441 P.2d 436, 442-43 (Okla. 1967); *see* 15 Okla Stat. §163; *see also* Lum v. Lee Way Motor Freight, Inc., 757 P.2d 810, 815 (Okla. 1987) ("Whether a contract is ambiguous so as to require extrinsic evidence or whether the language is ambiguous and hence permits consideration of surrounding circumstances are questions of law for the court." (emphasis added)).  But cf. Restatement (Second) of Contracts §202 (1981) (language of contract should be interpreted "in light of all the circumstances"); Id. cmt. a (this rule "do[es] not depend upon any determination that there is an ambiguity.").  If interpretation of an ambiguous contract "depends upon extrinsic facts as to which there is a dispute, its construction is a mixed question of law and fact, and is for the jury…." Brogden v. Perryman, 176 Okla. 505, 56 P.2d 398, 399 (Okla. 1936) (internal quotation marks omitted); *see* Polk v. Bartlett, 365 P.2d 987, 989-90 (Okla. 1961).

### C.  Overview of Reinsurance

"Reinsurance is 'the insurance of one insurer (the "reinsured") by another insurer (the "reinsurer") by means of which the reinsured is indemnified for loss under insurance policies issued by the reinsured to the public.'" Travelers Casualty & Surety Co., v. Certain Underwriters of Lloyd of London, 96 N.Y.2d 583, 734 N.Y.S.2d 531, 534, 760 N.E.2d 319 (2001); Christiana General Insurance Corp. v. Great American Insurance Co., 979 F.2d 268, 271 (2nd Cir. 1992).  Reinsurance is purchased by reinsureds to insure their liability under policies issued to their insureds. North River Insurance Co. v. Cigna Reinsurance Co., 52 F.3d 1194, 1199 (3rd Cir. 1995)

There are generally two types of reinsurance:  facultative and treaty.  Christiana General Insurance Corp. v. Great American Insurance Co., 979 F.2d at 271.  Treaty reinsurance obligates the reinsurer to accept in advance a portion of certain types of risks that the reinsured (or ceding

company) underwrites.  Id.; Travelers Casualty & Surety Co., v. Certain Underwriters of Lloyd of London, 96 N.Y.2d 583, 734 N.Y.S.2d at 534, 760 N.E.2d 319.  Facultative reinsurance is policy-specific, meaning that all or a portion of the reinsured's risk under a specific contract of direct coverage will be indemnified by the reinsurer in the event of loss.  Id.

In excess of loss reinsurance, such as the Agreements at issue in this case, the reinsurer insures "all or a percentage, usually high, of the excess of loss of the reinsured's risk, above a stated amount, after the collection of any proportional reinsurance up to a stated limit.  Id.; Ott v. All-Star Insurance Corp., 299 N.W.2d 839, 843 (Wis. 1981).  The "stated amount" is referred to as the "retention" above which the reinsurer is obligated to pay the reinsured's losses to the extent set forth in the contract.  Travelers Casualty & Surety Co., v. Certain Underwriters of Lloyd of London, 96 N.Y.2d 583, 734 N.Y.S.2d at 534, 760 N.E.2d 319; Ott v. All-Star Insurance Corp., 299 N.W.2d at 843.  The interests of both the reinsurer and the reinsured are furthered through the reinsured's efficient investigation and defense of the claim and through the resolution of the claim on the best terms possible.  North River Insurance Co. v. Cigna Reinsurance Co., 52 F.3d at 1194, 1199.

### D.   Rules of Reinsurance Contract Interpretation

A reinsurance contract is governed by the same rules of construction applicable to contracts generally.  Christiana General Insurance Corp., of New York v. Great American Insurance Co., 979 F.2d 268, 274 (2nd Cir. 1992); Affiliated FM Insurance Co. v. Constitution Reinsurance Corp., 626 N.E.2d 878, 880 (Mass. 1994).  An ambiguous reinsurance contract is generally construed against the reinsurer.  Christiana General Insurance Corp., of New York v. Great American Insurance Co., 979 F.2d at 278, citing, 19 Couch on Insurance §80:49; Zenith Ins. Co. v. Employers Insurance of Wausau, 141 F.3d 300, 304 (7th Cir. 1998); Affiliated FM

Insurance Co. v. Constitution Reinsurance Corp., 626 N.E.2d at 881; Employers Mutual Liability Insurance Co. v. Underwriters at Lloyd's, 117 F.2d 249, 252 (7th Cir. 1949). Where a reinsurance contract is ambiguous, the court may refer to extrinsic evidence in order to ascertain the parties' intent. Christiana General Insurance Corp., of New York v. Great American Insurance Co., 979 F.2d at 274. Such extrinsic evidence may, in an appropriate case, include evidence of industry custom and practice. Id.; accord, Affiliated FM Insurance Co. v. Constitution Reinsurance Corp., 626 N.E.2d at 881-82 (where reinsurance contract is ambiguous, evidence of custom and trade practice may be admitted to arrive at an interpretation "which appears to be in accord with justice and common sense and the probable intentions of the parties.")

   **E.  The Mulbery Claim:  Counts I and III**

The Receiver seeks a declaration that $498,000 paid on the Mulbery claim by HCC is reimbursable "loss" under ERC's Reinsurance Agreement. In the event this Court agrees with the Receiver, then the Receiver is entitled to summary judgment in the amount of $498,000 under Count I for breach of contract. Additionally, the Receiver asks for a declaration that ERC is obligated to pay an additional sum of $201,237 as reimbursable claim expenses for the Mulbery claim. Therefore, the total amount due and owing the Receiver on the Mulbery claim is $699,237 plus prejudgment interest from June 11, 2003 forward. The facts and circumstances of the dispute arising from the Mulbery claim are set forth in the Statement of Uncontroverted Facts 1 through 18.

   **1.  Legal Argument for why the $498,000 settlement payment on the Mulbery Claim is "Loss"**

The Receiver's entitlement to reimbursement for the Mulbery claim can be resolved by this Court as a matter of law. The plain and unambiguous language of the Reinsurance

Agreement expresses the mutual intention of HCC and ERC that ERC "agrees to indemnify the Reinsured against loss as indicated in Item 7D of the Reinsurance Schedule." "Loss" is defined in the agreement to be: "such amounts as are actually paid by the Reinsured [HCC] in settlement of claims or in satisfaction of awards or judgments." (S.O.F. 19). Item 7D of the Reinsurance Schedule required ERC to indemnify HCC for 100% of the Reinsured Policy Limit. The "Reinsured Policy Limit" as stated in 7B of the Reinsurance Schedule was: "5,000,000 EACH OCCURRENCE AND ANNUAL AGGREGATE WHERE APPLICABLE IN EXCESS OF UNDERLYING LIMITS." (Exh. 8) The Underlying Limits were $1,000,000. Therefore, under the plain language of the reinsurance agreement ERC is bound to indemnify HCC for 100% of the amount of loss paid in excess of the underlying limits of $1,000,000.

The facts of the Mulbery settlement reveal that HCC paid $498,000 of loss in excess of the underlying $1 million primary limits in settlement of the Mulbery claim. The "Mulbery claim" that was settled consisted of (a) the $1,000,000 actual damage award from the verdict in Phase I of the trial; (b) an undetermined amount of punitive damages yet to be assessed in Phase 2 of the trial; (c) an undetermined amount of statutory plaintiff's expenses; (d) an undetermined amount of prejudgment interest; (e) an unresolved claim to pierce the corporate veil and/or assess alter ego liability against companies related to the insured Amity; and (f) Amity's claim for insurance coverage for punitive damages under the umbrella policy. At the time of the settlement there had been no formal judgment entered. The $1,750,000 settlement was paid to settle all of the pending claims. The $498,000 paid by HCC in excess of the $1,000,000 primary limits was "paid in settlement of claims" and fits within the definition of "loss" which ERC must indemnify.

HCC intended at the time it paid $1,498,000 towards the settlement to exhaust the underlying $1,000,000 limit and pay an additional $498,000 under the umbrella policy.

It is true that HCC had taken the previous position with Amity that punitive damages were not covered under the primary or underlying policies. However, this coverage position, taken before the Mulbery claim was settled, does not mean the $498,000 was not paid under the umbrella policy. Amity disagreed with HCC's coverage position. Amity expressed in writing that it was of the opinion that punitive damages were covered under the facts of the Mulbery claim. ERC and HCC were both aware of Oklahoma law permitting insurance coverage for punitive damages assessed on a vicarious basis. By settling the Mulbery claim, HCC also settled Amity's claim for punitive damage coverage. Therefore, it is appropriate to consider the $498,000 as "loss" for which ERC must indemnify HCC.

In addition to punitive damages qualifying as "loss" under the reinsurance agreement, it is also clear that a payment for potential statutory plaintiff's expenses under the Oklahoma Nursing Home Care Act is "loss" for which ERC must indemnify HCC. ERC drafted the reinsurance agreement. It is a preprinted form in which ERC selected and defined the term "loss." ERC chose to define "loss" to include "such amounts as are actually paid . . . in settlement of claims." ERC chose not to define "loss" as being limited to only "damages." Further, ERC also expressed its intentions as to what was not "loss." ERC wrote that "loss" shall not include claim expenses." ERC did not further state that "loss" did not include "costs." ERC's intentions, shown by the plain language, did not restrict the definition of loss to exclude payments for a plaintiff's attorney's fees. So, ERC's attempt to restrict its own definition of "loss" to only "damages" is impermissible under the plain and unambiguous definition of loss.

The final reason that ERC owes the $498,000 to HCC is under the doctrine known as "Follow the Settlements" or "Follow the Fortunes."  The Follow the Fortune/Settlement Doctrine requires a reinsurer to abide by the reinsured's decision to settle and its decision as to post-settlement allocation, provided the allocation is (1) reasonable, (2) made in good faith, and (3) within the terms of the applicable underlying policies and reinsurance contracts.  North River Ins. Co. v. Ace American Reins. Co., 361 F.3d 134 (2d Cir. 2004). ("North River II")  Also see the unpublished opinion of Hartford Accident and Indemnity Co. v. Ace American Reins. Co., 2005 WL 3663930 (Conn. Super) *6 and Hartford Accident & Indemnity Co. v. Columbia Casualty Co., 98 F. Supp.2d 251, 258 (D. Conn. 2000).  Under this reinsurance doctrine, the reinsurer cannot dispute good faith determinations that a risk was covered by the underlying insurance policy or good faith interpretations of policy terms.  Id.  As its label implies, the "Follow the Fortune/Settlement Doctrine" prevents facultative reinsurers "from second guessing good faith settlements and obtaining de novo review of judgments of the reinsured's liability to its reinsured."  Id. North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1199 (3d Cir. 1995).  Therefore, the reinsurer's burden of showing bad faith on the reinsured's part is a high one:  The reinsurer must show the reinsured's gross negligence, recklessness, bad faith, or that the settlement was not even arguably within the scope of the reinsurance coverage.  Hartford Accident, 98 F.Supp.2d at 258.  Consequently, "subject to the requirements of good faith and a reasonable, businesslike investigation, the ceding company may bind the reinsurer to follow its settlement fortunes when it concedes that a particular claim falls within the scope of coverage provided by the ceding company's policy.  Id.

It is well established that the Follow the Fortune Doctrine applies to all outcomes, including settlements and judgments.  North River Ins. Co. v. Ace American Reinsurance Co.,

361 F.3d 134, 140 (2d Cir. 2004).  The main rationale for the doctrine is to foster the "goals of

maximum coverage and settlement" and to prevent courts, through "de novo review of [the

cedent's] decision-making process," from undermining "the foundation of the cedent-reinsurer

relationship."  Id. at 140-141.  The Follow the Settlements Doctrine has been applied to post-

settlement allocation decisions.  Id.

It is HCC's position that the Follow the Fortunes doctrine is inherent in the

Reinsurance Agreement.  In support of this position HCC can present case law and industry

custom and practice.   In Am. Employer's Insurance. Co. v. Swiss Reins. Am. Corp., 275

F.Supp.2d 29, 35, Fn 32 (D.Mass. 2003) it was stated:

> "Whether the "Follow the Fortunes" and "Follow the Settlements"
> Doctrines apply in the absence of express contractual language
> remains an open question.  Although not universally accepted, the
> favored view is that "Follow the Fortunes" and "Follow the
> Settlement" are an industry custom, and apply even in the absence of
> express language to that effect.  Cases holding that "Follow the
> Settlements" Doctrine is inherent in every reinsurance contract
> include Aetna Cas. & Surety Co. v. Home Ins. Co., 882 F.Supp.
> 1328 (S.D. N.Y. 1995), International Surplus Lines Ins. Co. v.
> Certain Underwriters at Lloyd's London, 868 F. Supp. 917 (S.D.
> Ohio 1994) and National American Insurance Co. of Cal. v. Certain
> Underwriters at Lloyd's London, 93 F.3d 529 (9th Cir. 1996) (later
> reversed by the 9th Cir.)

Other courts have been hesitant to read terms into a contract given divergent

precedent.  See Affiliated F.M. Ins. Co. v. Employers Reinsurance Corp., 369 F.Supp.2d 217,

226-227.

In questioning the court precedent implying the provision, the Affiliated F.M. Ins. v.

ERC court noted that "Follow the Settlement" clauses are often included in reinsurance

certificates.  The court held that it seemed logical that if the "Follow the Settlements" doctrine

was so widely accepted as an inherent part of every reinsurance contract that the doctrine may be

read into every certificate as a matter of law, there would be no need to include such clauses in reinsurance contracts.  Id. at 227.

There is no express authority from the 10th Circuit or Oklahoma courts on whether the Follow the Fortunes doctrine is inherent in every reinsurance agreement.  It is important to note that HCC's reinsurance expert, Robert Hall, has testified that industry custom and practice supports the conclusion that the follow the settlements doctrine is inherent in every reinsurance contract.  (Exh. 30 p. 48:24- p 57: 18).

In summary, this Court should declare that the $498,000 paid by HCC is "loss" under the reinsurance agreement.  The plain and unambiguous language of the agreement supports the Receiver's position that the $498,000 was paid by HCC in settlement of the Mulbery claim. Additionally, under the Follow the Fortunes/Follow the Settlements Doctrine ERC is bound by HCC's reasonable position to consider the $498,000 as being paid under the umbrella policy thereby triggering ERC's contractual indemnity obligation.

## 2. Legal Argument for why the $201,237 paid on the Mulbery Claim is Claim Expenses

In addition to the $498,000 sought from ERC as "loss," the Receiver seeks an additional $201,237 as "claim expenses" on the Mulbery claim.  The $201,237 represents ERC's pro rata share of the expenses paid by HCC in defending and investigating the Mulbery claim.  It is the Receiver's position that claim expenses are due and owing under the Reinsurance Agreement because they were paid by HCC on this covered claim.  The language of the agreement supporting the Receiver is:

> IV.  INDEMNITY FOR CLAIM EXPENSES.  The Corporation [ERC] hereby agrees that, as respects reinsurance afforded by the other terms of this certificate, the Corporation will, with respect to each occurrence (each claim if written on a claims made basis), indemnify the Reinsured [HCC] against that proportion of

claim expenses paid by the Reinsured that the amount of the loss ultimately borne by the Corporation bears to the total amount of the loss."
(S.O.F. 8)

There is no dispute that the Mulbery claim was a covered occurrence under the Reinsurance Agreement. Further, ERC does not contest that HCC paid claim expenses to defend and investigate the Mulbery claim. The claim expenses are covered by the plain language of ERC's indemnity obligation in the agreement.

ERC's objection to paying the claim expenses rests on its contention that claim expenses were not paid under the umbrella policy. Rather, ERC argues, until a settlement payment was made by HCC which exhausted the primary limits of $1,000,000, all claim expenses were the sole obligation of the primary policy and paid under the primary policy. ERC's argument continues that no defense costs became the responsibility of the umbrella policy.

ERC's position fails as a matter of law. The Reinsurance Agreement's plain language does not support ERC's position. ERC has an indemnity obligation to pay all claim expenses if HCC "paid" a "loss" that used reinsured umbrella limits. The definition of "claim expenses" is not limited to only those claim expenses paid under the umbrella policy. If ERC wanted such a limitation it could have included it in the definition.

There is evidence that ERC did have a practice of paying claim expenses even though no defense costs were incurred under the umbrella policy. On January 30, 2004 HCC reminded ERC that ERC had always paid primary policy expenses on a pro rata basis on reinsured excess policies. (S.O.F. 40) Also, Anita Matson, HCC's claim representative handling the Mulbery claim, is sure she requested ERC to pay pro rata share for incurred expenses on other files. (Id.) It was on three or four other files. (Id.) She does not remember the insured's names. (Id.)

In conclusion, this Court should declare as a matter of law that the plain and unambiguous language of the reinsurance agreement requires that ERC indemnify HCC for ERC's pro rata share of claim expenses on the Mulbery claim. The total amount due and owing is $201,237.

### F.  The Hepatitis Claim:  Counts II and IV

#### 1.  Legal Argument on Allocation on the Hepatitis Claim (Counts II and IV)

HCC, through the Receiver, requests that summary judgment be entered in HCC's favor declaring that HCC's $8 million settlement payment should be allocated as being paid $4 million for the 2000-2001 policy year and $4 million for the 2001-2002 policy year. This equal allocation between two policy years is appropriate under the "Follow the Fortunes" doctrine applicable to reinsurance. The facts and circumstances of the dispute between HCC and ERC arising from the settlement of the Hepatitis litigation are set forth in the Statement of Uncontroverted Facts 19-40.

The equal allocation is material to the Receiver because it leaves $1 million umbrella coverage available to NRH for the 2000-2001 policy year and $1 million umbrella coverage for the 2001-2002 policy year. This additional umbrella coverage is 100% reinsured by ERC. The umbrella coverage is available for claims against NRH unrelated to the Hepatitis claim that fall within the 2000-2001 and 2001-2002 policy years. The Receiver is still adjudicating claims made against NRH during these two policy years which NRH has tendered for coverage. The most significant claim that is still pending during the 2001-2002 policy year is the Mitchell claim.  (S.O.F. 41)  The Mitchell claim is against NRH. (Id).  It arises during the 2001-2002 policy year. (Id.)  It is a death case involving a man who was treated for a bleeding

ulcer in the NRH emergency room. (Id.)  The file is still in discovery. (Id.)  The Mitchell claim

has been reported to the Receiver as having a potential exposure as high as $1,000,000. (Id.)

ERC has improperly rejected HCC's equal allocation of the $8 million NRH

settlement contribution.  ERC has unilaterally allocated the HCC settlement contribution as $3

million to the 2000-2001 policy year and $5 million to the 2001-2002 policy year.  Under ERC's

allocation, the entire $3 million primary policy limits and $2 million umbrella policy limits for

the 2001-2002 policy year have been paid.  As a result, the full limits of the primary and

umbrella policies for the 2001-2002 policy period have been exhausted.  NRH is therefore left

completely uninsured for any claims, including the Mitchell claim, that fall within the 2001-2002

policy year.  NRH is also left with a full $2 million in umbrella limits for claims arising during

the 2000-2001 policy period.

HCC's post settlement equal allocation decision should be upheld as a matter of

law.  There have not been located any Oklahoma or Tenth Circuit decisions on the subject of

settlement allocation decisions and the doctrine of Follow the Fortunes.  However, other courts

that have addressed the subject have found that HCC's decision on allocation must be upheld

unless ERC can show bad faith, unreasonableness, or that the settlement was clearly outside the

scope of coverage.  ERC has not alleged any such defenses.  Therefore, as a matter of law HCC's

equal allocation is proper.

Allocation issues arose following the settlement of a large environmental claim in

National Union Fire Ins. Co. of Pittsburg v. American Re-Ins. Co., 441 F.Supp.2d 646 (S.D.N.Y.

2006).  National Union (the Reinsured) issued an insurance policy for one year to Milacron.  The

policy provided $5 Million coverage after Milacron's $5 Million self insured retention was

exhausted.  National Union purchased reinsurance coverage from American Re reinsuring up to

$4 Million in excess of the first $5 Million of National Union's coverage. Both the National Union policy and the American Re policy contained broad pollution exclusion clauses.

Milacron was named a defendant in a lawsuit alleging personal injury as a result of certain metal working fluids at one of Milacron's plants. The claim spanned a number of years in which National Union issued policies to Milacron. However, only one policy year, the 1994-1995 year was reinsured through American Re.

Ultimately the claims in the underlying case were settled. Milacron allocated claims of 21 of the plaintiffs evenly between its 1993-1994 policy (a policy in which there was no reinsurance) and the 1994-1995 policy (the one reinsured by American Re). National Union initially questioned whether the allocation was proper and consistent with Ohio law. However, National Union ultimately decided to honor the allocation rather than engage in the risks inherent in litigation with the claims.

When allocating the claims of the 21 plaintiffs, Milacron allocated amounts to each year that exceeded the policy maximum. National Union paid on those claims pursuant to Milacron's allocation. National Union then attempted to collect from American Re as reinsurer. American Re refused payment. The trial court found in favor of National Union and against American Re and granted National Union's motion for summary judgment. The court applied the Follow the Fortunes Doctrine and held American Re was required to follow the fortunes of National Union unless National Union paid a settlement that was "clearly or manifestly outside the scope of the reinsured's policy coverage." No reasonable fact finder could find that National Union's payment was not at least arguable.

The court also felt Milacron's allocation decisions were at least arguably correct and it was reasonable for National Union to accept Milacron's allocation decision. America Re

was prohibited from engaging in judicial inquiry into the propriety of National Union's post-settlement allocation where the settlement itself was in good faith, reasonable and within the terms of the policies.  Id. at 652.  (Citing to Travelers Casualty & Surety Co. v. Gerling Global, 419 F.3d 181 (2d Cir. 2005)).

In again citing to Travelers Casualty, the court noted with approval:

"[i]ndeed, a cedent choosing among several reasonable allocation possibilities is surely not required to choose the allocation that minimizes its reinsurance recovery to avoid a finding of bad faith . . . An allocation that increases reinsurance recovery – when made in the aftermath of a legitimate settlement and when chosen from multiple possible allocations – would rarely demonstrate bad faith in and of itself."

Finally, the court found that the apparent inconsistency between National Union's initial belief that Milacron's allocation decision was incorrect and its ultimate acceptance of that allocation in seeking reinsurance coverage was not evidence of unreasonableness and/or bad faith.  To the contrary, the court found at most it evidences that National Union took various legitimate factors and risks into account when deciding whether to settle the claims made against it.  This is an examination of which it is not appropriate for a reinsurer to challenge under the Follow the Settlements Doctrine.

Reinsurance allocation issues pertaining to an asbestos settlement were at issue in American Insurance Company v. American Re-Insurance Company, 2006 WL 3412079 (N.D. Cal. Nov. 27, 2006).  American Insurance (Fireman's Fund) provided excess insurance to General Refractories Company (GRC), a manufacturer of asbestos.  In turn, Fireman's Fund purchased reinsurance from the reinsurer American Insurance.  Two reinsurance facultative policies were purchased.  One was for the 1978-1979 year and the second was for the 1979-1980 policy year.  The reinsurer agreed to insure 50% of the two excess policies.  Neither facultative

certificate contained express "follow the settlements" or "follow the fortunes" provisions. GRC and Fireman's Fund entered into a $37 Million settlement. Fireman's Fund in turn sought $2.9 Million reinsurance coverage for the portion of the settlement allocated to the 1978-1979 excess policy. The reinsurer argued that the underlying insurance for the excess policies was not exhausted and therefore there was no duty to indemnify.

The parties moved for cross summary judgment. Fireman's Fund argued judgment was appropriate in its favor because under the "follow the fortunes/settlement" doctrine the reinsurer cannot challenge the $2.9 Million allocation. Fireman's Fund made this argument even though the reinsurance certificates did not contain a typical Follow the Settlement/Fortunes clause. Fireman's Fund argued, however, that the clause should be read into the insurance certificates as a matter of law.

The court held that Fireman's Fund was entitled to present evidence demonstrating whether at the time the reinsurance certificates were entered into "Follow the Settlement/Fortune" clauses were widely understood by reinsurance industry custom and practice to be a tacit part of every facultative reinsurance contract. The court held there was not sufficient evidence on this point and therefore denied summary judgment and gave the parties the opportunity to present the custom and practice evidence.

An issue as to reinsurance coverage allocation for asbestos liabilities was discussed in North River Ins. Co. v. Ace American Reinsurance Co., 2002 WL 506682 (S.D.N.Y. 2002) (referred to as "North River I"). North River Insurance Company insured an asbestos manufacturer, Owens Corning Fiberglass (OCF) with several layers of excess insurance, ranging from $26 Million to $76 Million. North River purchased facultative reinsurance from Ace for the lowest layer of coverage, the $26 - $30 Million layer. Coverage issues arose

between OCF and North River and other carriers.  The OCF coverage litigation was ultimately settled for $335 Million.  North River used a special methodology to allocate the settlement amount and assumed a single occurrence for each year of coverage.  As a result of the methodology, the OCF settlement was allocated almost entirely to the layer of coverage reinsured by Ace.  Ace disputed North River's allocation methodology.  Ace contended the post settlement allocation differed from the pre settlement analysis North River had conducted.  In North River I, the court granted North River's motion for summary judgment and ordered Ace to pay over $24 Million in reinsurance coverage.

The decision in North River I was appealed to the 2nd Circuit in North River Ins Co. v. Ace American Reinsurance Co., 361 F.3d 134 (2nd Cir. 2004) (referred to as "North River II").  The 2nd Circuit affirmed the district court's finding that the Follow the Settlements Doctrine applies to a reinsured's post settlement allocation decisions.  The Follow the Settlements Doctrine applied regardless of whether there was an inconsistency between the pre  settlement assessments of risk and the post settlement allocation so long as the allocation meets the typical Follow the Settlements requirements, i.e., is in good faith, reasonable, and within the applicable policies.  Id. at 141.  The 2nd Circuit reversed the district court on the issue of prejudgment interest.  The portion of the judgment that was reversed has nothing to do with the allocation analysis.

In conclusion, HCC's equal allocation of the NRH settlement contribution between the 2000-2001 and 2001-2002 policy years should be declared binding on ERC.  The Follow the Settlements doctrine binds ERC to HCC's allocation decision.  ERC is prohibited from challenging HCC's allocation decision.  ERC has not alleged and can show no material facts disputing HCC's good faith and reasonableness in making an equal allocation.  ERC cannot

show any facts that the settlement was outside the scope of coverage of the umbrella policies. HCC and the Receiver have taken various legitimate factors and risks into account in making the decision to approve an equal allocation. Therefore, summary judgment should be granted in favor of HCC on the allocation issue.

### 2. Legal Argument on Claim Expenses of $152,160 on the Hepatitis Claim

The Hepatitis claim also concerns a claim by the Receiver to reimburse HCC $152,160 in claim expenses incurred in the defense of the Hepatitis claim. The Receiver is entitled to a judgment in her favor because ERC had paid such claim expenses previously. ERC denies any such obligation to pay any claim expenses because such expenses were not incurred under the umbrella policy. Rather, ERC contends that all claim expenses were paid under the primary policy and not the umbrella policy.

On January 27, 2004 HCC made a claim for claim expenses to ERC (S.O.F. 39) As of January 27, 2004 HCC had spent approximately $430,000 in defense and handling of the Hepatitis claim.(Id.) Under the formula of the Reinsurance Agreement ERC would be obligated to pay a pro rata share of expenses which totaled $144,480 in current expenses. (Id.) (The total amount of claim expenses sought from ERC is $152,160).

On February 4, 2004 ERC denied HCC's request to be paid claim expenses. (S.O.F. 39) ERC took the position for the first time that all defense costs were paid under the primary policy and not the umbrella policy. (Id.). HCC representative Birkinsha protested against ERC's position and reminded ERC that ERC had always paid primary policy expense on a pro rata basis when reinsured excess policies were involved. (S.O.F. 40)

The Reinsurance Agreement's plain language supports the Receiver's position that claim expenses are due. There is no doubt the payments made for defense of the Hepatitis

claim qualify as "claim expenses" under the Reinsurance Agreement definition.  The Agreement requires ERC to indemnify HCC "against the proportion of claim expenses paid by the Reinsured [HCC] that the amount of the loss ultimately borne by the Corporation bears to the total amount of the loss." (S.O.F. 8)  ERC chose to define "claim expenses."  ERC did not limit "claim expenses" to those paid by the Reinsured under the umbrella policy.  Rather, ERC chose to define claim expenses as those "paid by the Reinsured."  The plain meaning of the definition of "claim expenses" includes the amounts sought by the Receiver for the Hepatitis claim.

## V.     <u>CONCLUSION</u>

Plaintiff State of Oklahoma, ex rel., Kim Holland, Insurance Commissioner, As Receiver of Hospital Casualty Company requests an order granting summary judgment in her favor.

s/Vincent F. O'Flaherty
Vincent F. O'Flaherty          Mo. 34693
SPRADLEY & RIESMEYER, P.C.
4700 Belleview Avenue, Suite 210
Kansas City, MO  64112
(816) 753-6006 – Telephone
(816) 502-7898 – Facsimile

Robert A. Nance, OBA No. 6581
George M. Emerson, OBA No. 13159
RIGGS, ABNEY, NEAL, TURPEN, ORBISON &
LEWIS
5801 Broadway Ext., Suite 101
Oklahoma City, OK  73118
(405) 843-9909 - Telephone
(405) 842-2913 - Facsimile

Michael E. Waldeck
9393 W. 110th Street, Bldg. 51
Overland Park, KS  66210
913-323-4910 - Telephone
913-323-4911 -  Facsimile

ATTORNEYS FOR PLAINTIFFS

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of May 2007, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of Notice of Electronic Filing to the following ECF registrants:

Mr. James W. Connor Jr.
Mr. Thomas D. Hird
Mr. Jeffrey C. Baum
Mr. Stephan S. Mathis
Mr. Phil R. Richards
Richards & Connor
12th Fl. Parkcenter Bldg.
525 South Main St.
Tulsa, Oklahoma 74103-4509
ATTORNEYS FOR DEFENDANT ERC

s/Vincent F. O'Flaherty