IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

STATE OF OKLAHOMA, ex rel.
KIM HOLLAND, Insurance Commissioner,       )
As Receiver of Hospital Casualty Company,  )
                                           )
                Plaintiffs,                )
vs.                                        )        NO.  CIV-06-0426-HE
                                           )
EMPLOYERS REINSURANCE                      )
CORPORATION,                               )
                                           )
                Defendant.                 )

## ORDER

Kim Holland, the Insurance Commissioner for the State of Oklahoma, is the court-appointed receiver of Hospital Casualty Company ("HCC").  In her capacity as receiver and as part of her duties in effecting the liquidation of HCC, she brought this action against defendant Employers Reinsurance Corporation ("ERC"), contending that HCC is entitled to recover from ERC for certain claims under reinsurance policies issued by ERC in HCC's favor.  ERC removed the case to this court.[1]

Both parties have filed motions for summary judgment.  Both motions are fully briefed.[2]  The court heard oral argument on the motions on July 31, 2007.

Background

---

[1] *The Insurance Commissioner was appointed as receiver in state court proceedings, District Court of Oklahoma County, Oklahoma, which proceedings are ongoing.  As she asserts here the rights of HCC, this order refers to the receiver and HCC interchangeably.*

[2] *References in this order to particular exhibits refer to the exhibits attached to the summary judgment briefs of the parties.*

HCC issued primary and excess general liability insurance policies to Amity Care Corp. d/b/a Grace Living Center ("GLC"), which is in the nursing home business, and to Norman Regional Hospital ("NRH"). HCC reinsured the excess policies through ERC.[3] The Receiver alleges ERC breached the reinsurance agreements by failing to reimburse/indemnify HCC for monies it paid in settlement of claims asserted against GLC ("Mulbery claim") and NRH (the "hepatitis claims").[4] In addition to seeking damages, the Receiver requests a declaration that ERC has certain obligations under the reinsurance agreements, including the duty to reimburse HHC for various payments it has made. The plaintiff also alleges that ERC breached an oral agreement it made when resolving the hepatitis claims and asserts the defendant is equitably estopped from denying the oral agreement or contending that the NRH excess policy for 2001-2002 has been exhausted. The specific facts and circumstances relating to each of the claims are substantially undisputed and are set out more fully in connection with the court's discussion of each of the claims.

<u>The Mulbery claim</u>.

GLC purchased from HCC a primary general liability policy in the amount of $1,000,000 per occurrence and an excess liability policy in the amount of $5,000,000, both

---

[3]*The various excess liability policies were reinsured by multiple facultative reinsurance policies/certificates for the different policies and policy years in question. "Facultative" reinsurance involves the reinsurer assuming some or all of the reinsured's risk on a specific underlying insurance policy. See* <u>Unigard §. Ins. Co. v. North River Ins. Co.,</u> *4 F.3d 1049, 1054 (2nd Cir. 1993).*

[4]*The Mulbery and hepatitis claims are unrelated to each other, but are being pursued by the receiver in a single proceeding.*

2

providing insurance coverage for the period from October 1, 1998, through October 1, 1999. Based at least in part on acts alleged to have occurred during the policy period, Amity was sued by the estate of Bonnie Mulbery, a resident in one of Amity's nursing homes, and her heirs. The Mulbery suit went to trial in state court, with the jury ultimately returning a verdict for plaintiffs in the amount of $1,000,000 in compensatory damages and also concluding that plaintiffs had established the necessary basis for an award of punitive damages. A second-stage proceeding for determination of the amount of punitive damages was scheduled, but the parties and HCC reached an agreed settlement as to the entire case prior to any further decision by the jury.

The case settled for the amount of $1,750,000, with $1,498,000 of that amount being contributed by HCC. Thereafter, HCC made demand on ERC, under the reinsurance agreement, for reimbursement of $498,000 as indemnity and for an additional $194,758.46 as ERC's pro rata share of incurred expenses. ERC declined to pay these amounts.

At the time HCC entered into the settlement, it estimated GLC's potential exposure to be between $2,200,000 and $2,800,000. These numbers were based on actual damages (per the jury's verdict) of $1,000,000, prejudgment interest of $121,185.34, estimated punitive damages of $500,000 to $1,000,000, and estimated plaintiff's statutory expenses of $600,000 to $650,000.[5]   After absorbing the first million of the actual HCC settlement contribution ($1,498,000) via the primary policy, HCC argues the excess ($498,000) is "loss"

---

[5] *Plaintiff's brief, Fact 12.*

3

within the meaning of the reinsurance policy and hence subject to reimbursement by ERC.[6]

ERC argues here that there has been no "loss" within the meaning of the reinsurance policy, because neither the amounts attributable to punitive damages nor those attributable to "plaintiff's statutory expenses" qualify as loss and, absent those items, the amounts paid by HCC were fully absorbed by the (non-reinsured) primary policy.[7]

The punitive damages question is dispositive of the issue.[8]  ERC's argument is that HCC was not obligated to pay anything attributable to punitive damages, as Oklahoma's public policy generally prohibits liability insurance coverage for punitive damages.[9]  ERC further argues that the exception to the Oklahoma non-coverage rule does not apply here.

It is true that Oklahoma law does not ordinarily permit an insured to shifts its potential liability for punitive damages to others (i.e. an insurance company) via liability insurance. Dayton Hudson Corp. v. Amer. Mutual Liab. Ins. Co., 621 P.2d 1155, 1160 (Okla. 1980).

---

[6]*The reinsurance policy defines "loss" as "such amounts as are actually paid by the Reinsured [HCC] in settlement of claims or in satisfaction of awards or judgments." Para. III of the reinsurance certificate, Exhibit 6 to ERC's brief.*

[7]*It is undisputed that the "prejudgment interest" item in HCC's exposure calculation is wholly covered by the "supplementary payments" coverage of the underlying primary policy.  As a result, HCC's excess policy as to GLC — and ERC reinsured only the excess policy — is not impacted.  Therefore, the prejudgment interest item is not "loss" payable under the reinsurance policy.*

[8]*ERC conceded at oral argument that if HCC had exposure for the punitive damages claim, then its claim for reimbursement under the reinsurance policy was valid.  In light of the court's disposition of that question, it is unnecessary to determine whether the nature of the "plaintiffs' statutory expenses" provides an additional basis for coverage.*

[9]*The parties agree that Oklahoma law determines the issues in this case.*

4

However, Oklahoma recognizes an exception to that rule where the insured's liability for punitive damages is based on the insured's vicarious liability for the acts of another. Id. As the Tenth Circuit has stated: "Oklahoma courts adhere to the view that public policy prohibits liability insurance coverage of punitive damages except where the party seeking the benefit of insurance coverage has been held liable for punitive damages solely due to conduct of another, under principles of vicarious liability." Mangum Foods Inc. v. Continental Cas. Co., 36 F.3d 1491, 1497 (10th Cir. 1994). Whether HCC had potential exposure to GLC for any punitive damages that might ultimately be assessed against GLC thus depends on the nature of GLC's potential liability.

The undisputed facts establish that the claims against GLC by the Mulbery estate included both direct and vicarious claims.[10] While ERC argues that the majority of the claims were attributable to theories of direct liability by GLC (e.g. negligent hiring, negligent supervision), it is clear that at least some of the claims — some of the potential grounds for the jury's determination that punitive damages were appropriate — were vicarious in nature. Some of GLC's exposure was based on the alleged negligent or wrongful acts of its employees, who were alleged to be acting within the scope of their employment.[11] The parties concede that claims of both types went to the jury and nothing in the jury's verdict (or otherwise) suggests what basis the jury may have relied on in concluding punitive

---

[10]*Petition in Mulbery case (*Henricks v. Amity Care LLC*, Case No. CJ-2001-6179, District Court of Oklahoma County), Exhibit 10 to plaintiff's brief.*

[11]*Petition, para. 17.   Ex. 10 to plaintiff's brief.*

5

damages were appropriate.  In such circumstances, where the basis for the jury's decision can't be determined, the damages are presumed to be covered by the insurance policy. Mangum Foods Inc., 36 F.3d at 1499 ("If it were impossible to determine on what basis the jury made its award, the damages would be presumed to be covered.")  Thus, in the circumstances existing here, HCC was liable to its insured (up to the limits of the various policies) for the punitive damages that would ultimately have been awarded had the trial progressed to its conclusion.[12]  Having resolved that exposure by the settlement, the amounts HCC paid qualify as an amount "paid by the Reinsured in settlement of claims" within the meaning of the reinsurance certificate.  ERC is therefore obligated to reimburse HCC for the $498,000 paid by HCC under the excess policy, plus prejudgment interest on that amount computed from June 11, 2003.[13]

The hepatitis claims

HCC issued primary and excess general liability policies in favor of Norman Regional Hospital (NRH) for several years.  As relevant here, it issued two separate $3,000,000 primary general liability policies providing coverage for the policy years July 1, 2000, through July 1, 2001, and July 1, 2001, through July 1, 2002.  It issued two separate excess

---

[12]*It is true that HCC took the erroneous position, internally and in discussions with its insured, that punitive damages were not covered by the policies.  See Exhibits 14 & 15 to plaintiff's brief; Ex. 12 to ERC's brief.  However, it is also clear that GLC strongly disputed that assertion and, in light of the above discussion, would have ultimately prevailed on the issue.  (The settlement eliminated the possibility of any future development at trial clarifying the basis for the jury's verdict.)*

[13]*The dispute as to claim expenses on the Mulbery claim is addressed below.*

general liability policies, each in the amount of $2,000,000, for the same years.  As was the case with the GLC policies discussed above, HCC reinsured only the excess policies with ERC.

The hepatitis claims against NRH arose out of a pain management clinic it maintained. From August, 1999, to May, 2002, a registered nurse anesthetist employed by NRH "repeatedly reused needles and syringes on possibly as many as 900 patients who came to the NRH pain management clinic for treatment."  Fact 24, plaintiff's brief.  This resulted in the patients' exposure to various life threatening diseases, including hepatitis.  By 2002,  a number of lawsuits and a class action against NRH and others were being pursued by the exposed or infected patients.   Extensive settlement discussions followed during 2003, culminating in a mediation held on August 7, 2003.  A tentative global settlement of the hepatitis claims was reached at that time,[14] involving a lump sum cash payment to the claimants of $25,120,000.  Of this amount, approximately $11,000,000 was contributed by or on behalf of NRH.  HCC was to provide $8,000,000 of the $11,000,000 under its policies, with NRH supplying the balance itself.[15]

The issue in this case is the allocation of the $8,000,000 between the relevant policy years.  HCC alleges that an agreement was reached at the August 7, 2003, mediation pursuant

---

[14]*The settlement, negotiated on plaintiffs' behalf by a plaintiffs' counsel coordinating committee, was tentative in that the final consent of the multiple plaintiffs involved had to be secured.*

[15]*The various dollar amounts referenced in the discussion of the hepatitis claims are approximate, used for ease of discussion.*

to which NRH, HCC and ERC agreed that the $8,000,000 would be allocated equally to the two policy years involved.  The effect of this allocation (the 4/4 split) would be to exhaust the primary policies in both years and to use $1,000,000 (of the available $2,000,000) of the coverage under the excess policies, leaving $1,000,000 of coverage in both years to cover other, unrelated (or at least unsettled) claims against NRH.  ERC disputes that any such agreement was reached, arguing instead that an allocation of $3,000,000 to the 2000-2001 policy year and of $5,000,000 to the 2001-2002 policy year was intended.  The effect of this allocation (the 3/5 split) would be to exhaust both the primary and excess coverage in the 2001-2002 policy year, leaving both HCC and ERC without further exposure as to that year. This allocation also has the effect of leaving NRH without insurance coverage (at least insofar as HCC or ERC are concerned) for other outstanding and unresolved claims applicable to that policy year.

In support of the position HCC now asserts as to the allocation agreement, the Receiver relies principally, if not exclusively, on the testimony of the attorney for NRH, Mr. Huff, who participated in the various meetings between NRH and the insurers in the mediation.  Although Mr. Huff cannot point to any particular statement he claims to have been made by representatives of either HCC or ERC as to the claimed agreement, his deposition testimony would be sufficient to create a fact question as to whether an agreement as alleged was reached in connection with the August, 2003, mediation.[16]  Further, it is

---

[16]*There is substantial evidence to the contrary, including the deposition testimony of Mr. Birkensha, the HCC representative, and of Mr. Mussman, the ERC representative, as*

undisputed that Mr. Huff wrote a lengthy letter to HCC on August 26, 2003, with a copy to ERC, outlining in detail his view of the nature and status of the settlement and including his view that a 4/4 split was contemplated, or at least was the result of other positions or developments.[17]  Neither HCC nor ERC disagreed or otherwise responded to letter and it is this letter upon which HCC now bases its equitable estoppel claim.

If the present motions turned on the question of whether an agreement was reached in August, 2003, as to the allocation issue, the motions would have to be denied so a jury could sort out the competing factual claims.  However, in light of other undisputed facts in this case, the court concludes the nature of the August 2003 discussions and/or agreement is not dispositive of this dispute.  It is undisputed that on January 27, 2004, Ray Birkensha, the claims manager for HCC (and HCC's representative in the hepatitis claims negotiations) wrote a letter to Glenn Mussman, ERC's representative as to this matter.[18]  This date was approximately one week before the global settlement was funded and actually accomplished.  The Birkensha letter detailed HCC's view of the settlement and, most importantly for present purposes, included an explicit allocation of the settlement amount between the pertinent

---

*well as the undisputed evidence that the great majority of the claims asserted involved occurrences in the 2001-2002 policy year.  Further, neither Mr. Huff's testimony nor his letter is unequivocal as to an express agreement having been reached.*

[17]*Exhibit 25 to ERC's brief.*

[18]*Exhibit 22 to ERC's brief.  HCC notes that Mr. Birkensha has since become an employee of ERC.  Whatever impact that changed status might have on Mr. Birkensha's credibility were he now to testify to some fact, it does not alter the undisputed fact that the 1/27/04 letter was sent and that it represented the position of HCC.*

policy years and made an indemnity demand on ERC based on that allocation.[19]  It is also undisputed that ERC was in full agreement with the allocation made by HCC in the Birkensha letter and that it provided the requested funds in explicit reliance on HCC's allocation in that letter.[20]  It is also undisputed that, while NRH objected to this HCC/ERC agreement as to allocation, and perhaps frantically so, HCC did not change its position between the date of the Birkensha letter and the funding of the settlement in February.[21]  All parties concede that the funding of the settlement in February was made pursuant to the 3/5 allocation stated by HCC in the Birkensha letter.[22]  The undisputed facts thus establish that HCC made its allocation of the settlement liability between the two policies, made an explicit indemnity demand based on that allocation, and caused ERC to perform based on that allocation and demand.  In light of these undisputed facts, the court concludes the 3/5 split must govern the resolution of the present dispute between HCC and ERC.[23]

---

[19]*The letter noted there were 14 plaintiffs whose claims arose in the 2000-2001 period and 71 whose claims arose in the 2001-2002 period.  Based on that, the HCC letter included an explicit "calculation of indemnification from the respective policies" and made demand for payment based on that calculation.  The letter also noted "It has been HCC's position that the excess policy limits for the 2001-2002 policy year are exhausted by the scope and severity of the claims in that time period.  We are looking to ERC to contribute the limits of this excess policy pursuant to the terms of the reinsurance agreement for this policy."*

[20]*Mussman (ERC) letter to Birkensha (HCC), Exhibit 28 to ERC's brief.*

[21]*It is not clear from the present submissions when HCC (or the Receiver, for HCC) made the decision to change its position as to the allocation.*

[22]*Fact 60, ERC's brief, uncontested by HCC.*

[23]*The existence of a factual dispute as to what agreement was reached in August, 2003, may afford NRH some further basis for claim against HCC and/or ERC.  The court*

As against this conclusion, HCC principally relies on its contention that the "follow the settlements" doctrine requires that HCC's present position as to allocation between the policy years be followed. The "follow the settlements" doctrine is the application, in the settlement context, of the broader concept or doctrine of "follow the fortunes." These doctrines are concepts unique to the reinsurance relationship and are designed to prevent the reinsurer from second-guessing the good faith, reasonable decisions of the reinsured entity. In general, the "follow the fortunes" doctrine binds the reinsurer to accept the cedent's (reinsured's) decisions on all things concerning the underlying insurance terms and on claims against the underlying insured, so long as the decisions are in good faith, reasonable, and within the applicable policies. North River Ins. Co. v. ACE American Reinsurance Co., 361 F.3d 134, 139-140 (2nd Cir. 2004). There is substantial authority for the view that, in applying the doctrine, it applies not only to settlement decisions by the cedent, but also to post-settlement allocation decisions by the cedent. Id.; Travelers Cas. & Surety Co. v. Gerling Global Reins. Corp. of America, 419 F.3d 181 (2nd Cir. 2005). HCC argues here that the doctrine is an implied term of every reinsurance contract, whether expressly included or not, that it applies to post-settlement allocations and that ERC is therefore bound to the allocation between policy years which HCC now urges.

ERC argues that the doctrine does not apply at all, as there is no provision to that

_expresses no view as to whether any such claim or claims exists, or would be successful, but merely notes that this case involves only the relative rights of HCC and ERC against each other._

effect in the reinsurance certificates in this case.  It cites to a number of cases which hold that the doctrine will not be imposed in the absence of an agreement by the parties.

Both parties concede there is no Oklahoma or Tenth Circuit authority addressing the question of whether or when the "follow the fortunes" doctrine applies.  There is substantial authority elsewhere supporting both views.  Given the fact that an express "follow the fortunes" provision is often included in reinsurance agreements,[24] this court is reluctant to impose such a term in the absence of an agreement.  Both parties to reinsurance agreements are ordinarily sophisticated, fully counseled entities capable of carefully protecting their respective interests by negotiation of the terms of the reinsurance obligation.  However, the court concludes it is unnecessary to resolve the issue in order to determine the allocation issue here.  Even assuming, as HCC argues, that the doctrine is potentially applicable and that it would apply to post-settlement allocations by the reinsured, it does not ultimately support HCC's position in the circumstances of this case.  Here, the HCC letter of January 27, 2004, was an explicit allocation of a known, liquidated risk by the reinsured.

As noted above, the parties reached a tentative settlement in August, 2003.  In the following months, further negotiations ensued and the consent of the various plaintiffs was obtained.  The settlement amount to be provided by HCC (and ERC) never changed during that period.  In the face of that known amount of the HCC/ERC liability, HCC contacted

---

[24]*Both the* *North River* *and* *Travelers* *decisions cited above involved express provisions.* *Travelers,* *419 F.3d at 184: "As is customary, those certificates contained provisions under which Gerling agreed to be bound by any loss settlements entered into by Travelers ...."*

12

ERC.  HCC did not proceed to close merely on the basis of some earlier pre-settlement estimate of total exposure.  Rather, it went further and <u>explicitly effected the allocation</u> between the applicable policy years.  This case is therefore unlike the ones HCC relies on, where the reinsured allocated a settlement different from a pre-settlement analysis or where it allocated a settlement with no prior discussions on that subject.  Here, what HCC is effectively seeking to do is to let it explicitly allocate the risk between policy years once and then, some time later, <u>re</u>-allocate it on some different basis.  None of the cases applying the "follow the settlements" doctrine stretch it that far.[25]

In sum, the undisputed facts show HCC to have effected, relative to ERC, an explicit allocation between policy years based on the "3/5 split."  There is no basis for it's current effort to have a second bite at the apple.

Claim expenses

The Receiver seeks to be indemnified for HRC's "claim expenses" with respect to both the Mulbery and hepatitis claims – $201,237 on the Mulbery claim and $152,160 on the hepatitis claims.  ERC contends the plaintiff is not entitled to be reimbursed for HCC's defense costs, asserting that the Receiver has confused ERC's role, "treating it as a reinsurer

---

[25]*Though not discussed at length in its summary judgment motion, the undisputed facts also show the invalidity of HCC's effort to rely on equitable estoppel to support its position (complaint, count VI).  The facts show that both HCC and ERC received Mr. Huff's letter, that both failed to respond to it, that both were aware of the NRH position by the time the settlement was funded, and that <u>both</u> HCC and ERC nonetheless proceeded to close on the basis of the allocation that HCC explicitly stated.  Whatever applicability the equitable estoppel doctrine might have as to NRH, it has none as to HCC's claim against ERC.*

13

of a primary policy rather than a reinsurer of an excess policy."   Defendant's response, p.

11.  The pertinent provisions of the reinsurance agreements[26] state:

> I. APPLICATION OF CERTIFICATE.  This Certificate applies to the lines of business specified in Item 7A of the Reinsurance Schedule[27] under the Reinsured's policy identified in Item 4 of the Reinsurance Schedule (the "Reinsured Policy")[28] ....
>
> III. DEFINITION OF LOSS AND CLAIM EXPENSES.  "The unqualified word "loss" shall mean only such amounts as are actually paid by the Reinsured in settlement of claims or in satisfaction of awards or judgments; but the word "loss" shall not include claim expenses.
>          ....
> The term "claim expenses" shall mean court costs, interest upon judgments and allocated investigation, adjustment and legal expenses.
>
> IV. INDEMNITY FOR CLAIM EXPENSES.  The Corporation [ERC] hereby agrees that, as respects reinsurance afforded by the other terms of this certificate, the Corporation will, with respect to each occurrence (each claim if written on a claims made basis), indemnify the Reinsured [HCC] against that proportion of claim expenses paid by the Reinsured that the amount of the loss ultimately borne by the Corporation bears to the total amount of the loss.

Defendant's Exhibit 6.

The Receiver maintains that, under these provisions, once HCC paid a "loss" that

exceeded the primary policy limits,  ERC was required to reimburse HRC for ERC's pro rata

---

[26]*The provisions in the three reinsurance certificates ERC issued HCC that are pertinent to a determination of ERC's liability for claim expenses are identical.  For convenience, in its discussion the court will refer to the reinsurance policies in the singular.*

[27]*Item 7A specifies the Lines of Business as "COMMERCIAL EXCESS – UMBRELLA POLICY, OCCURRENCE FORM."  Defendant's Exhibit 6.*

[28]*It is undisputed that HCC reinsured only its excess/umbrella policies with ERC. Plaintiff's Fact Nos. 7, 21.*

share of <u>all</u> expenses HCC paid to investigate and defend the claim.[29]  She relies on the

definition of  "claim expenses," asserting that because the term is not limited to "only those

claim expenses paid under the umbrella policy," plaintiff's brief, p. 27, ERC is liable for its

proportionate share of the total amount of HRC's claim expenses, including those incurred

under the primary policy.   ERC argues that, as the reinsurer of the excess policy, its

responsibility to indemnify HRC for claim expenses is triggered by the exhaustion of the

primary policy limits.   ERC contends that it is not obligated under the reinsurance

agreements to pay claim expenses. because, with respect to both the Mulbery and the

hepatitis claims, those limits were exhausted and all claim expenses ended simultaneously

when the claims were settled.

Under Oklahoma law the general rules of contract construction apply to the

interpretation of insurance contracts.  <u>Employers Reinsurance Corp. v. Mid-Continent Cas.</u>

<u>Co.</u>, 358 F.3d 757, 764 (10th Cir. 2004).  The policy is interpreted "'to give effect to the

mutual intention of the parties, as it existed at the time of contracting ....'"  *Id.* (quoting 15

Okla. Stat. § 152).   "[T]he contract should be construed according to the plain meaning of

---

[29]*The Receiver calculated ERC's asserted share of the claim expenses for the Mulbery claim ($194,758.46), by dividing the amount ERC paid under the excess policy ($498,000) by the total amount HRC paid to its insured ($1,498,000), and then multiplying the quotient (.33) by the total claim expenses ($585,839.72).  Using the same method of calculation, the Receiver determined the amount she contends ERC owes as claim expenses for the hepatitis claims.  Plaintiff's brief, Fact 16.  The Receiver does not explain the discrepancy between the amounts calculated in her brief ($194,758.46 and $144,480),and the amounts she now seeks to recover ($201,237 and $152,160).  See plaintiff's brief, Fact 16, and pp. 26, 34.  For purposes of the motion the difference is irrelevant.*

its language," *id.* (citing 15 Okla. Stat. §§ 154, 160), and "'to give a reasonable effect to all of its provisions.'" The Yaffe Cos., Inc. v. Great American Ins. Co., ___ F.3d ___, ___ (10th Cir. 2007) (quoting Duensing v. State Farm Fire & Cas. Co., 131 P.3d 127, 134 (Okla. Civ. App. 2005); 36 Okla. Stat. § 3621 ("Every insurance contract shall be construed according to the entirety of its terms and conditions ....").

Initially, the court must determine as a matter of law whether the contract is ambiguous. The Yaffe Cos., Inc., ___ F3.d at ___. "'Insurance contracts are ambiguous only if they are susceptible to two constructions.'" *Id.* (quoting Max True Plastering Co. v. U.S. Fid. & Guar. Co., 912 P.2d 861, 869 (Okla. 1996). "'The mere fact the parties disagree or press for a different construction does not make an agreement ambiguous.'" Employers Reinsurance Corp., 358 F.3d at 764 (quoting Pitco Production Co. v. Chaparral Energy, Inc., 63 P.3d 541, 545 (Okla. 2003).

Here, both parties claim the contract provisions are unambiguous, yet differ in their interpretation of the reinsurance agreement.  The court finds the policy language to be unambiguous and agrees with ERC that, considering the policy as a whole, it cannot reasonably be construed to provide coverage for HCC's claim expenses. The Receiver's interpretation is reasonable only if the term "Reinsured" is construed to refer to HCC in its capacity as both the primary and excess insurer, and only if other sections of the reinsurance contract and general principles of law applicable to reinsurance agreements are ignored.

"Reinsurance is a contract whereby one insurer transfers or 'cedes' to another insurer all or part of the risk it has assumed under a separate or distinct policy ...."  1A S. Plitt, D.

Maldonado & J. Rogers, *Couch on Insurance 3D*, §9.1, p. 9-3 (2005) (emphasis added) (hereinafter "Couch").  "Because the reinsurance agreement is a contract of indemnity, the liability of the reinsurer is inextricably tied to the loss of the reinsured." *Id.* at § 9:24, p. 9-67.  *Accord* Nat'l Union Fire Ins. Co. of Pittsburgh v. American Re-Ins. Co., 351 F.Supp.2d 201, 208 (S.D.N.Y. 2005) ("The scope of the risks assumed by a reinsurer depends upon the terms of the policies that are reinsured.") (internal quotations omitted).   Here, however, the reinsured did not suffer a loss.  HCC did not pay or incur any claim expenses in its capacity as the excess insurer.  HCC was obligated under its excess policies to pay defense/claim expenses only "when the limits of liability of the primary insurance or other insurance have been exhausted by payment of judgments or settlements." Defendant's Brief, Exhibit 2.  The Receiver did not dispute that the liability limits of the primary policies issued by HCC to GLC and NRH were not exhausted until the cases were settled, defendant's brief, Facts 8,36, plaintiff's response, pp. 6-7,12; or ERC's assertion that the claim expenses were incurred prior to settlement. Defendant's brief, p. 23.

"Most jurisdictions that have addressed the question have concluded that where an insured has both primary and excess liability insurance, the excess insurer is not responsible to participate in the costs of defense until after the limits of the primary policy are exhausted."[30]  United States Fid. and Guar. Co. v. Federated Rural Elec. Ins. Corp., 37 P.3d

---

[30]*The policies in these cases, like the excess policies issued by HCC,  explicitly stated that liability for defense costs would not attach until the primary coverage has been exhausted. E.g. Colorado Farm Bureau Mut. Ins. Co. v. North American Reinsurance Corp., 802 P.2d 1196, 1198 (Colo.Ct.App.1990) (" If underlying insurance is exhausted by any*

828, 832-33 (Okla. 2001). Oklahoma follows the majority rule that "the duty of an excess insurer to participate in the insured's defense is triggered only by exhaustion of the primary policy." *Id*. at 833; Texas Employers Ins. Ass'n v. Underwriting Members of Lloyds, 836 F.Supp. 398, 407 (S.D.Tex. 1993) ("Where, as in this case, an insured purchases one policy specifically as primary coverage and another as excess coverage, to require the excess insurer to reimburse a primary carrier for amounts that were paid before exhaustion of the underlying policy limits would overturn the reasonable expectations of the parties."). Therefore, it would appear that because "no liability [for claim expenses] has attached against the insurer [HCC] under the original contract, there can be no recovery against the reinsurer, for nothing exists upon which to base an indemnity." Michigan Millers Mut. Ins. Co. v. North American Reinsurance Corp., 452 N.W.2d 841, 842 (Mich.Ct.App.1990) (citing 19 Couch 2d, § 80.66, pp. 673-74). *See* Nat'l Union Fire Ins. Co. of Pittsurgh, 351 F.Supp.2d at 208 ("[T]he reinsurer is not required to pay for losses that are not covered under the underlying policy....").

Nonetheless, the general rule yields to the particular agreement reached by the contracting parties, as "it is the language of the reinsurance contract that will ultimately determine the extent of the reinsurer's liability to the reinsured." Couch, § 9:24, p. 9-67. The policy provisions do not, though, support the plaintiff's claim for indemnification. The

---

*occurrence <u>the company shall be obligated to assume charge of the settlement of [sic] defense</u> of any claim or proceeding against the insured resulting from the same occurrence.").*

first provisions of the reinsurance agreement set forth its scope – the reinsurance certificate applies to HCC's commercial excess-umbrella  policy ("the lines of business specified in Item 7A of the Reinsurance Schedule under the Reinsured's policy identified in Item 4 of the Reinsurance Schedule (the 'Reinsured Policy')).  It does not provide coverage for the primary policies which HCC also issued to GLC and NRH, but rather states that "[ERC] hereby agrees to indemnify the Reinsured as indicated in Item 7D of the Reinsurance Schedule" –  against loss up to 100% of the excess-umbrella  policy limit.   Defendant's Exhibit 6, § II, Item7D.

While the term "loss" does not include claim expenses, the policy section governing their reimbursement states that ERC "hereby agrees that, as respects reinsurance afforded by the other terms of this certificate," *id.* § IV (emphasis added), ERC will indemnify the Reinsured for its proportionate share of claim expenses.  In other words, ERC will pay HCC for claim expenses it incurs in conjunction with the excess policy that ERC is reinsuring.  *See* Michigan Millers Mut. Ins. Co., 452 N.W.2d at 843 (only the settlement of claims involving the reinsurance contract was binding on the reinsurer when loss payable was defined as  "All insurance policy *claims involving this reinsurance ...*.").  As the certificate designates the underlying excess-umbrella policy as the "Reinsured Policy," any references to the "Reinsured" are obviously intended to mean HCC in the capacity in which it is reinsured, as the excess carrier. [31]

---

[31]*To the extent the Receiver asserts that she is entitled to reimbursement for claim expenses by application of the follow the fortunes doctrine, her argument fails, as the*

Because HCC was acting in a dual capacity as both the primary and excess insurers, the policy might have been clearer if § III had limited "claim expenses" to those paid under the excess-umbrella policy.[32]  However, it is evident from other provisions in the reinsurance agreement that ERC did not agree to pay for its pro rata share of the expenses HCC paid under the primary policy.  Read in context, the indemnity clause for claim expenses "merely obligates [ERC] to pay a share of defense costs incurred specifically under the [excess] policy."  Colorado Farm Bureau Mut. Ins. Co. v. North American Reinsurance Corp., 802 P.2d 1196, 1197 (Colo.Ct.App.1990).  As it is undisputed no claim expenses were incurred under that policy, the Receiver's motion with respect to her cause of action for claim expenses will be denied and ERC's motion will be granted.

Accordingly, both parties' motions for summary judgment [Doc. Nos. 74, 82] are **GRANTED IN PART** and **DENIED IN PART**.  The Receiver is **GRANTED** summary judgment on Count I (breach of contract on the Mulbery claim) and in part on Count III (declaratory judgment as to "loss" on the Mulbery claim), and **DENIED** summary judgment on Count II (claim expenses on the hepatitis claims); Count III (declaratory judgment on claim expenses on the Mulbery claim); Count IV (declaratory judgment on the loss

_____

*doctrine does not create reinsurance where it did not at least arguably exist under the specific terms of the contract.  See Nat'l Union Fire Ins. Co. of Pittsurgh,, 441 F.Supp.2d 646, 650-51 (S.D.N.Y. 2006)*

[32]*As noted by the Tenth Circuit in Employers Reinsurance Corp., 358 F.3d at 767, reinsurance contracts are dissimilar from standard insurance contracts in that the "parties typically have comparable bargaining power in negotiating the terms of their contracts."*

allocations and claim expenses on the hepatitis claims; Count V (breach of oral contract); and Count VI (equitable estoppel).  ERC is **DENIED** summary judgment on Count I and in part on Count III (declaratory judgment as to "loss" on the Mulbery claim), and **GRANTED** summary judgment on the remaining claims.  ERC is obligated to reimburse HCC for the $498,000 paid by HCC under the excess policy and HCC effected, relative to ERC, an explicit allocation between policy years based on the "3/5 split."  Finally, ERC is not obligated to reimburse HCC for claim expenses with respect to the Mulbery and hepatitis claims.

The parties are directed to prepare and submit, by **September 24, 2007**, a proposed journal entry of judgment consistent with this order.

**IT IS SO ORDERED**.

Dated this 13th day of October, 2007.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE

21